AO 91 (Rev. 11/11)  Criminal Complaint

SEALED BY ORDER OF THE COURT

# UNITED STATES DISTRICT COURT
### for the
Northern District of California

| | |
|---|---|
| United States of America<br>v.<br><br>RICHARD SZE<br><br><br><br>_____<br>*Defendant(s)* | )<br>)<br>)<br>)<br>)<br>)<br>) |

Case No. **CR 21-71680-MAG**

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____ in the county of _____San Jose_____ in the
___Northern___ District of ___California___ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1343 | Wire Fraud |
| 18 U.S.C. § 1346 | Honest Services Wire Fraud |
| 18 U.S.C. § 1349 | Conspiracy to Commit Wire Fraud |
| 18 U.S.C. § 1956 | Concealment Money Laundering |

This criminal complaint is based on these facts:

See attached Affidavit of the Federal Bureau of Investigation Special Agent Michael Tomeno

☑ Continued on the attached sheet.

Approved as to form: /s/ William Frentzen
AUSA William Frentzen

/s/ Michael Tomeno
*Complainant's signature*

FBI SA Michael Tomeno
*Printed name and title*

Sworn to before me by telephone.

Date: ___10/27/2021___

*Judge's signature*

City and state: ___McKinleyville, California___

Hon. Robert M. Illman, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF APPLICATION FOR A CRIMINAL COMPLAINT

I, Michael Tomeno, Special Agent with the Federal Bureau of Investigation ("FBI"), being duly sworn, hereby declare as follows:

## OVERVIEW

1.      I make this affidavit in support of a criminal complaint charging KEVIN CHAO ("CHAO") with Wire Fraud, Honest Services Wire Fraud, Conspiracy to Commit Wire Fraud, and Money Laundering. This affidavit is also presented in support of a criminal complaint charging RICHARD SZE ("SZE") with Conspiracy to Commit Wire Fraud and Money Laundering. CHAO and SZE will be collectively referred to as the **TARGET SUBJECTS**. The charges stem from a kickback scheme CHAO and SZE orchestrated from at least 2016 through 2020 while managing a Division of "Company-1" (to be further described below), a company with a large office in San Jose, California, in violation of Title 18 U.S.C. §1343 (Wire Fraud); §1346 (Honest Services Wire Fraud); §1349 (Conspiracy) and §1956 (Money Laundering).

2.      The statements contained in this affidavit are based upon my personal observations, my training and experience, information from records and databases, and information obtained from other agents and witnesses. This affidavit does not set forth all my knowledge about this matter; it is intended to only show that there is sufficient probable cause for the requested warrants.

## AFFIANT BACKGROUND

3.      I am an "investigative or law enforcement officer of the United States" within the meaning of Section 2510(7) of Title 18, United States Code, that is, an officer of the United States who is empowered by law to conduct investigations, to execute search warrants, and to make arrests for offenses of Federal law.

4.      I have been employed as a Special Agent with the FBI since May 2019. I am currently assigned to a Complex Financial Crime Squad of the FBI's San Francisco Division. As part of my

assigned duties, I investigate possible violations of federal criminal law, specifically investigations involving complex financial crimes and white-collar crime. My training included the five-month FBI Special Agent Basic Training program at the FBI Academy in Quantico, Virginia. During the course of my employment with the FBI, I have investigated and assisted in the investigation of criminal violations relating to corporate fraud, money laundering, healthcare fraud, wire fraud, and other complex financial crimes. During these investigations, I have participated in and utilized investigative techniques, including the following methods: conducted physical surveillance, conducted interviews, executed arrest/search/seizure warrants, analyzed financial records, and collected and processed evidence.

5.     Prior to the FBI, I spent approximately three years working as an accountant and accounting supervisor at a large private corporation and approximately four years working as an internal auditor and forensic accountant for a Certified Public Accounting firm. I have a bachelor's degree specializing in Accounting and a master's degree specializing in Forensic Accounting. I have been a Certified Fraud Examiner (CFE) since 2017. The CFE is a professional certification issued by the Association of Certified Fraud Examiners. As a CFE, I have received training and shown proficiency related to understanding financial fraud schemes and the related law, as well as conducting investigations of alleged fraud.

## APPLICABLE LAW

### *Criminal Statutes*

6.     **Wire Fraud:** Title 18, United States Code, Section 1343 reads, in pertinent part: Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or

sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

7.      **Honest Services Wire Fraud:** Title 18, United States Code, Section 1346 reads, in pertinent part:

For the purposes of this chapter, the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services.

8.      **Conspiracy to Commit Wire Fraud:** Title 18, United States Code, Section 1349 reads, in pertinent part:

Any person who attempts or conspires to commit any offense under [Chapter 63 of Title 18 of the United States Code] shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy.

9.      **Concealment Money Laundering:** Title 18, United States Code, Section 1956 reads, in pertinent part:

Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity…knowing that the transaction is designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity… shall be sentenced to a fine of not more than $500,000 or twice the value of the property involved in the transaction, whichever is greater, or imprisonment for not more than twenty years, or both.

10.     Pursuant to Title 18, United States Code, Sections 1956(c)(7) and 1961(1), violations of Title 18, United States Code, Sections 1343 and 1349 each constitute a "specified unlawful activity."

## RELEVANT INDIVIDUALS AND ENTITIES

11.    At all times relevant to this complaint:

a.    According to their 2021 Notice of Annual Meeting and Proxy Statement, a company that will hereafter be referred to as "Company-1", was a "global leader in industrial automation and digital transformation" which included "hardware and software productions, solutions, and services." Company-1's principal executive office was located in Milwaukee, Wisconsin. Company-1's common stock is traded on the New York Stock Exchange. Company-1 has a large office in San Jose, California, where the **TARGET SUBJECTS** worked during the relevant period.

b.    According to their website, SP Software Private Limited ("SPSoft") was an enterprise business software and information technology services company. Also according to its website, SPSoft was based in India. During interviews with the FBI, Company-1 employees stated that SPSoft had operations based out of India and China. SP Software LLC is SPSoft's branch in the United States. SP Software LLC was registered as a domestic corporation in California in November 2011. On a Statement of Information form filed with the California Secretary of State, SP Software LLC's type of business was software consulting, and the business was located at 2880 Zanker Road, Suite 203, San Jose, California 95134. During interviews conducted by Company-1's management, a former employee of Company-1 described SPSoft as on-site contractors that provided engineering services to Company-1. SPSoft employees based in China and India also provided services to Company-1.

c.    KEVIN CHAO ("CHAO") and RICHARD SZE ("SZE") worked for Company-1 at the San Jose, California office beginning in 2005, when Company-1 acquired the company CHAO and SZE were working for at the time. This company was a vendor of manufacturing execution systems ("MES") that was co-founded by CHAO. After the acquisition, CHAO

became the Global Business Director of Company-1, and SZE became a Manager of Software Engineering, reporting directly to CHAO. CHAO and SZE resigned from Company-1 in December 2019.

  d. Mooteec, LLC ("Mooteec") was a limited liability company headquartered in the State of California and described in California Secretary of State Filings as a "software services" company. As of September 2021, Mooteec was still listed as active on the California Secretary of State website. As further described below, Mooteec appears to have been created and used by CHAO and co-conspirators as a "shell corporation." Shell corporations exist only "on paper," with few or no employees, provide no services, and produce no products. Shell corporations are sometimes used for money laundering.

  e. Wells Fargo Bank and Citi Bank were financial institutions as defined in Title 18, United States Code, Section 1956(c)(6), and Title 31, United States Code, Section 5312. According to the Federal Deposit Insurance Corporation's ("FDIC") BankFind Suite database, Wells Fargo and Citi Bank are insured by the FDIC.

    i. Citi Bank is headquartered in New York, New York.

    ii. Wells Fargo is headquartered in San Francisco, California.

  f. The below individuals, whose identities are known to me, will be referred to as follows:

    i. "Employee-1" (or "E-1") worked in several roles at Company-1 from 1989 through early 2021, including as Senior Vice President of Enterprise Accounts and Software from early 2019 through early 2021.

    ii. "Employee-2" (or "E-2") worked as the Vice President of Enterprise Software at Company-1 from 2018 through early 2021.

iii.      "Employee-3" (or "E-3") worked in several roles at Company-1 from 1995 through the present, including as Vice President of Finance from 2017 through the present.

iv.      "Employee-4" (or "E-4") worked in several roles at Company-1 from 1997 through the present, including as Vice President of Law and Ombudsman from 2016 through the present.

v.      "Employee-5" (or "E-5") worked in several roles at Company-1 from 2011 through the present, including as a Commodity Manager from 2017 through the present.

vi.      "Employee-6" (or "E-6") worked in several roles at Company-1 from 2017 through late 2020, including as a Software Engineering Manager from 2018 through late 2020.

vii.      "Employee-7" (or "E-7") worked as a Product Manager at Company-1 from 2017 through late 2019.

viii.      "Employee-8" (or "E-8") worked in several roles at Company-1 from 2004 through the present, including as a Product Management Manager from 2016 through early 2021, and as a Business Manager from early 2021 through the present.

ix.      "Employee-9" (or "E-9") worked as a Junior Software Engineer at Company-1 from 2015 through late 2019.

x.      "Employee-10" (or "E-10") worked as a Software Engineering Manager at Company-1 from 2006 through the present.

xi.      "Employee-11" (or "E-11") worked in several roles at Company-1 from 2014 through the present, including as Director of Operations and Information Applications from late 2020 through the present.

xii.      "Employee-12" (or "E-12") worked in several roles at Company-1 from 1996 through the present, including as Vice President of Corporate Development Strategy from late 2020 through the present.

xiii.      "Employee-13" (or "E-13") worked as a Management Assistant at Company-1 from 2000 through late 2019.

xiv.      As described further later, "Reference-1" (or "R-1") was a majority owner of SPSoft China and had previously worked at a company that had contracted with Company-1 (hereafter referred to as "Company-2").

## FACTS SUPPORTING PROBABLE CAUSE

### *Overview*

12.     As further described below, CHAO, SZE, and other known and unknown co-conspirators, received kickbacks after steering software development work from Company-1 to SPSoft. As part of the scheme, SPSoft created false or inflated invoices. CHAO and SZE, with the assistance of others, caused Company-1 to pay the invoices. SPSoft then sent funds to CHAO and SZE through a company CHAO and SZE controlled, called Mooteec, to CHAO and SZE's personal bank accounts. CHAO and SZE implemented procedures within their department at Company-1 to reduce the transparency of this activity. These kickbacks specifically violated the terms of employment at Company-1 and the employment contracts between the **TARGET SUBJECTS** and Company-1.

### *Whistleblower Complaint*

13.     In October 2019, a Company-1 employee who was resigning from the company reported to Company-1's Human Resources that "something funny" was happening between CHAO and SPSoft. During an exit interview conducted by Company-1, the employee asserted there was undue leniency given to SPSoft by CHAO. The employee also noted that CHAO granted SPSoft more privileges than CHAO did to other Company-1 employees, such as company sponsored travel and attendance to trade

shows. Company-1 launched an internal investigation, which led to the analysis of SPSoft's invoices to Company-1.

### *Company-1's Internal Investigation*

14.     In December 2019, Company-1 interviewed CHAO and SZE as part of Company-1's internal investigation. When questioned about any companies they held outside of Company-1, neither CHAO nor SZE mentioned Mooteec during their respective interviews. After the interviews, Company-1 informed CHAO and SZE that Company-1 would be taking CHAO and SZE's access badges and company-owned electronic devices. CHAO and SZE were asked not to leave the premises. However, CHAO and SZE both left the premises of Company-1 for a few hours. When they returned, they informed the company that they were resigning. Company-1 was able to recover the devices and subsequently provided them to the FBI. It is unclear whether CHAO and SZE were able to access the company-owned devices after the first interview with Company-1 and before they returned the devices to Company-1.

### *Background on Invoicing Process at Company-1*

15.     Company-1 provided documents outlining Company-1's Vendor Invoice Process. Company-1 generally pays vendors in one of two ways: (i) through a "PO Payment Process" and a "Non-PO Payment Process." Basically, invoices can be paid either with a purchase order or without a purchase order.

a.     Company-1's "Non-PO Payment Process" includes the following: A vendor is told to perform work. When the services are performed, a receipt is recorded in Company-1's SAP software. The "project manager" routes an invoice to Company-1's "On-Base" system. An approval link is sent to the contact for the vendor within Company-1. If the invoice is approved, payment is sent, and the invoices are posted to Company-1's SAP software.

b.       Company-1's "PO Payment Process" includes the following: A purchase order is generated through SAP and sent to the customer. A "statement of work" ("SOW") attesting to the work performed is prepared and signed by both Company-1 and the vendor. When an SOW milestone is achieved, periodically, a vendor will send an invoice to Company-1 via an electronic mailbox. The invoices are automatically uploaded into On-Base and then automatically posted to SAP by Company-1's "Strategic Sourcing" team. SAP matches the invoice to the purchase order and the receipt in SAP and approves the invoice for payment. After a review is conducted, either payment is sent, or the invoice is returned to the "project manager" for review. The "PO Payment Process" was implemented by Company-1 in addition to the already existing "Non-PO Payment Process" in 2015.

16.       Per Company-1, invoices paid through the "Non-PO Payment Process" were supposed to be for low-dollar, non-recurring purchases. Depending on the amount, paying an invoice through the Non-PO Payment Process can require as little as the approval of one manager. A purchase order through the PO Payment Process, by contrast, was supposed to be used for higher-dollar, ongoing work. The PO Payment process includes additional controls around the purchase orders, including specified dates when the work is to be performed and a ceiling on the total amount to be paid. Based on my training and experience, typically, purchase orders are used to obtain pre-approval or advance notice for large, ongoing expenses or projects within a company, to plan for and explain these costs to management prior to incurring them, and to set limits on the actual cost of the projects or expenditures prior to incurring additional costs.

17.       According to E-1, a former supervisor of CHAO and SZE, contractors typically bid against a "scope of work." Once the vendor was selected, a purchase order would be "cut." When a job was approximately a third of the way through, some money was paid by Company-1 to the contractor.

18.       According to Company-1 employees:

*"From a transactional perspective it is nearly impossible to detect fraud when you have*

*collaboration with the vendor and two high ranking management employees even if the purchase*

*follows the PO process."*

19.     Current Company-1 employees believed that given the nature of the work and the dollar

amounts at issue, Company-1 should have used the purchase order process for SPSoft. Instead, CHAO

authorized payments to SPSoft through the Non-PO Payment process, allowing CHAO to circumvent

the purchase order controls. CHAO unilaterally approved SPSoft invoices and authorized his assistant to

approve SPSoft invoices using CHAO's credentials, in violation of Company-1 policy.

20.     As illustrated by the payment processes outlined previously, payments approved via the

"Non-PO Payment Process" have fewer checks and balances, less visibility, fewer approvals, and

require less review by individuals outside of a department than the "PO Payment Process." Based on my

training and experience, inappropriate, improper, or fraudulent invoices paid via the Non-PO Payment

Process would be less likely to be uncovered by other Company-1 employees.

### SPSoft

21.     Up until 2012, Company-1 used Company-2 as a software development vendor. In 2012,

Company-1 switched to using SPSoft for software development.

22.     According to E-2 (a former supervisor of CHAO), R-1 of SPSoft seemed to know

CHAO. R-1 owned 80 percent of SPSoft and had previously worked at Company-2.

23.     According to investigators hired by Company-1, R-1 worked at Company-2 until around

the time SPSoft was incorporated in China. This was around the same time Company-1 switched from

Company-2 to SPSoft for software development.

24.     From 2015 through 2019, SPSoft issued over 2,500 Non-PO invoices to Company-1.

Only two invoices, in 2019, were submitted via the PO Payment Process. On average, Company-1 paid

approximately 80 SPSoft Non-PO invoices each month. Each SPSoft Non-PO invoice was for an

average of approximately $8,800, an amount low enough so as not to trigger additional approvals. Company-1 management confirmed that the number of invoices were highly irregular and would have been a "red flag" had they noticed it sooner. According to Company-1 management, the payments to SPSoft for services rendered could have been made in a single transaction for the year.

25.     Based on information provided by Company-1, from 2015 to 2019, SPSoft invoiced CHAO's "cost centers" at Company-1, via the Non-PO Payment Process, for over $29 million. Invoices gradually increased over time; SPSoft invoiced Company-1 almost 300 times for over $2.5 million in 2015 and almost 900 times for over $10 million in 2019. In the last two years of the relationship, Company-1 paid SPSoft approximately $17 million, making SPSoft one of Company-1's largest vendors at the time.

26.     From 2015 to 2019, the vendor with the second highest billings to CHAO's cost centers billed Company-1 almost $2 million. All this vendor's billings to CHAO's cost centers were completed through the PO Payment Process.

27.     According to E-2, Company-1 used tools to measure progress, but progress for CHAO's department was not entered into these tools. Furthermore, according to E-2, CHAO was not using purchase orders, which would have required a Statement of Work ("SOW"). Therefore, Company-1 could not trace invoice charges to actual work done. Invoices without purchase orders were not intended to be used for recurring expenses and were instead intended to mostly be used for the purchase of goods. A purchase order involved dates, financial controls, and an SOW. Invoices typically were for lower dollar purchases and usually were meant for single-time jobs. Someone at Company-1 tracks purchase orders and there was a ceiling amount. According to E-2, for any payments above $100,000, CHAO would have had to get higher levels of approval at Company-1. CHAO only charged over $100,000 once in a while at Company-1.

28.     According to E-3, who had worked at Company-1 for over 23 years, and was the Vice President of Finance at Company-1, E-3 had never seen such a large number of invoices from a vendor at Company-1. Company-1's vendors were typically paid based on "milestones" or they were paid once or twice per month. CHAO gave his credentials to his assistant, E-13, to make invoice approvals, which was in violation of Company-1 policy.

29.     According to E-1, E-1 was stunned by the pile of invoices that E-4 showed him related to SPSoft and CHAO's department. E-1 did not understand why there were so many invoices paid to SPSoft. When told that SPSoft billed Company-1 almost $9 million in 2019, E-1 had no idea how SPSoft was receiving that much money from Company-1.

30.     During interviews conducted by investigators hired by Company-1, E-13 (CHAO's assistant) told investigators that E-13 spent approximately 70 percent of their time processing SPSoft invoice payments, and that E-13 received approximately 30 invoices per month from SPSoft.

31.     In or around the spring of 2018, Company-1's Commodity Management Department attempted to implement the purchase order process for software vendors. CHAO and SZE agreed to the purchase order process. Four other large vendors used by CHAO's department successfully moved from the Non-PO Process to the PO Process. Purchase order agreements were set up on seven SPSoft projects, however CHAO and SZE ignored the purchase order process and continued to pay SPSoft invoices through the Non-PO Payment Process.

32.     According to E-5, during the spring of 2018, E-5 had a conversation with CHAO regarding the systems in place for vendor payment and that CHAO should use the PO Payment Process to pay SPSoft. CHAO was not responsive to E-5's requests or e-mails in changing CHAO's process. CHAO eventually referred E-5 to his project managers, SZE and another manager in CHAO's department, regarding the payment process. E-5 tried to maintain monthly meetings regarding the new process, but SZE was usually "busy" or traveling.

33.     According to E-2, SPSoft became the largest vendor in the software branch of Company-1 and the third largest vendor in the Control Visualization Business (CVB). SPSoft completed work for Company-1, but the quality was bad, and the output was 30 percent of what it should have been. At one point, CHAO was asked to cut 20 SPSoft contractors, but instead CHAO moved them to another project managed by his department.

34.     During interviews with the FBI, at least two employees, E-6 and E-7, said they preferred other contractors to SPSoft, and that they had raised these concerns to SZE, CHAO, or both. Even after receiving this information, CHAO told the employees that he would prefer to use SPSoft.

35.     According to at least three Company-1 employees, E-7, E-8, and E-9, the quality of work completed by SPSoft was bad and that SPSoft contractors were not competent. These Company-1 employees said they had raised these concerns to SZE, CHAO, or both. Whenever negative feedback was given about SPSoft, CHAO would "berate" the Company-1 employees responsible.

36.     E-2 and E-3 answered questions sent by the FBI, including the following responses:

a.      During 2019, there was no statement of work prepared for SPSoft. Everything was billed based on time spent by SPSoft contractors and expenses incurred by SPSoft. There was no tracking of hours spent by SPSoft contractors in SAP (Company-1's accounting system) or elsewhere by CHAO's department. Visibility on how SPSoft was paid and tracked seemed limited to SZE, CHAO, and CHAO's assistant.

b.      Timesheets submitted by SPSoft were reviewed by CHAO's assistant. The information was provided and reviewed at a "very high level" and "could not be tied back to any specific work deliverables." In one of the employee's opinions, "the level of detail on these timesheets was not sufficient to use in approving the SP Soft invoices."

c.      E-3 thought, "It would have been very easy to overbill or bill for work not performed etc…the hourly rate charged by SP Soft was low and therefore looked attractive to

anyone assessing the relationship, however we do not know if they really worked these hours and what value we got for the amounts we were charged."

      d.     According to E-2, "It took several weeks to get visibility and it appears the invoice amounts were deliberately low and vague to make it difficult to understand what was happening or not happening."

      e.     According to E-3, "Because there was actual work being performed by SP Soft but no documentation on the expected hours to complete the work, and that the two Engineering Management personnel overseeing the work are involved in the suspected fraud, it is impossible for us to determine the amount of the overcharge."

### KEVIN CHAO and RICHARD SZE at Company-1

37.     As Company-1 employees, CHAO and SZE had fiduciary duties to Company-1. Moreover, in connection with their employment at Company-1, CHAO and SZE each signed the following conflict of interest policy:

*The company's long-established policy requires that directors, officers, and other employees avoid any situation involving employee employment or investment in other business activities which conflict, or might reasonably be expected to conflict, directly or indirectly, with the best interest of the Company, its subsidiaries, and affiliates. Directors, officers, and other employees owe a duty of loyalty to the Company which requires that they retain their independence of judgment and avoid circumstances where their personal interest, direct or indirect, may conflict with those of the Company or where their influence in the Company may be used for personal gain to the Company's disadvantage.*

38.     This document was signed by SZE in December 2005 and by CHAO in December 2005.

39.     In addition, Company-1 provided annual ethics training to employees. At some point Company-1 learned there were instances when E-13 had taken CHAO's training for him. Company-1 did not think E-13 took SZE's ethics training for him.

40.     During interviews conducted by investigators hired by Company-1, Company-1 employees provided the following information:

        a.     According to one of CHAO's supervisors at Company-1, E-2, CHAO's duties at Company-1 included the delivery of products with limited direction.

        b.     According to CHAO, CHAO's department's annual development budget was $28 million.

        c.     According to one of CHAO's subordinates at Company-1, E-10, CHAO set the department's budget. E-10 had not disagreed with a directive given by CHAO.

41.     According to E-1, E-1 depended on a director of engineering, CHAO, to monitor the scope of work performed by vendors. E-1 relied on CHAO (who was a subordinate of E-1's) to determine how many hours were needed to complete products. CHAO was a trusted advisor, and the executives at Company-1 trusted CHAO's judgment on hiring and controlling the spending of his department.

42.     According to E-4, the San Jose office of Company-1, where CHAO worked, acted independently, but was not given direction that it could act outside of corporate policy.

43.     According to two of CHAO's subordinates at Company-1, E-7 and E-8, all CHAO's directions were followed by his team, regardless of whether they disagreed, because CHAO was in charge of the department.

44.     According to one of CHAO's co-workers at Company-1, E-11, CHAO was in control of product management and engineering. CHAO basically ran the San Jose "campus" as its own entity and did not follow standard operating procedures conducted at other Company-1 locations. Eventually, and

recently, CHAO's duties were split into engineering and product management. When these duties were split, CHAO was in charge of all engineering and another employee was in charge of product management. CHAO was "shocked" when the two roles were split. Prior to the roles being split, CHAO made all the decisions, with the employees under CHAO not making any decisions without CHAO's input. CHAO pushed back whenever E-11 asked for specifics. E-11 had difficulty understanding the project work that employees under CHAO accomplished. There was also difficulty understanding what the end goal was for the projects that were worked on by CHAO's team.

45.     According to E-12, a Company-1 employee that CHAO reported to, when E-12 started at Company-1, CHAO handled all of engineering and marketing for the "Control Visualization Business" ("CVB") segment of Company-1. CHAO handled both engineering and marketing for this segment for 10 years. E-12 estimated that CVB had over $2 billion of sales annually, out of approximately $6.7 billion of sales for Company-1 as a whole, which made CVB the largest segment of Company-1. E-12 thought the "roadmaps" created before E-12 came to Company-1 did not go in depth, even for projects with budgets as high as $50 million. E-12 found the "portfolio planning" to be very weak in CHAO's department.

46.     According to E-12, CHAO was unhappy that he would only be in charge of engineering and another Company-1 employee would be in charge of product management. When these roles were split, CHAO could no longer control what products were needed. CHAO could only control how to make what was needed.

47.     According to E-12, approximately 50 to 60 percent of CVB work was done abroad. In E-12's experience, contractors typically only conducted about 20 to 30 percent of this type of work.

48.     E-2 thought employees feared CHAO and did not ask why they were tasked to do things by CHAO.

49.     According to E-13, CHAO's assistant, E-13 would give SPSoft invoices to SZE if there were issues with the invoices.

50.     E-7 thought SZE was not capable of delivering projects on time.

51.     According to E-10, at one time, all contractors (which would have included SPSoft contractors) for CHAO's department reported to SZE. SZE or CHAO's assistant approved all time sheets for contractors.

52.     According to E-6, SZE once told E-6 to "let go" of a contractor and move the work to SPSoft.

### Mooteec, LLC

53.     Company-1 reported its concerns about CHAO and SZE to the FBI in December 2019. The investigation uncovered the existence of Mooteec, LLC, an entity suspected of being a vehicle used to move illicit funds between SPSoft and accounts held by CHAO and SZE.

54.     Mooteec's Articles of Organization were filed in California in July 2013. Mooteec's Statement of Information, filed in September 2013, listed CHAO's brother-in-law, as the only manager.

55.     IRS Schedule K-1's (an IRS form for "Partner's Share of Income, Deductions, Credits, Etc.") issued from Mooteec to SZE and CHAO, from 2013 to 2019, list SZE as a 20 percent owner of Mooteec and CHAO as an 80 percent owner of Mooteec.

56.     During an examination of an e-mail account attributed to CHAO, reviewed subsequent to the execution of a federal search warrant, the FBI discovered an e-mail sent from a Certified Public Accountant to szerichard@gmail.com and kevin0422@yahoo.com. The e-mail addresses were labeled on the e-mail as "Richard Sze" and "Kevin Chao," respectively. The e-mail asked "Richard and Kevin" to review Mooteec's 2019 revised tax return and provided K-1's for CHAO and SZE. No other individuals were copied on this e-mail and there were no K-1's included for any other individuals. The e-mail also stated that the tax documents would be sent to "Kevin" for his signature.

57.     Mooteec opened two Wells Fargo bank accounts in August 2013, one account number ending in 7097 ("Mooteec Account 1") and another ending in 7337 ("Mooteec Account 2"). The account opening documents described Mooteec as a software development company. SZE was listed as an authorized signer for both Mooteec accounts. It appeared that both SZE and CHAO signed most of the checks from the Mooteec Accounts, including checks written to each other.

58.     I believe this information illustrates CHAO's and SZE's control of Mooteec.

59.     SPSoft opened a Citibank business checking account in November 2011 ("SPSoft Account"), account number ending in 2107. Nearly all the deposits in the SPSoft Account were from Company-1, totaling over $30 million.

60.     Mooteec bank records revealed that from January 2016 through February 2020, almost $17 million was deposited from the SPSoft Account into Mooteec Account 1. The majority of deposits received by Mooteec Account 1 were from the SPSoft Account with the exception of three checks totaling over $1.1 million from Norwell Software, a company owned by another Company-1 employee, as well as some banking fee reversals, payroll credits, and a wire transfer return. Withdrawals from Mooteec Account 1 included the following:

     a.     Over 100 wire transfers totaling over $7 million to Shanghai Bank, beneficiary SPSoft Suzhou (a bank account different than the "SPSoft Account" mentioned previously);

     b.     Over 30 wire transfers totaling approximately $2.1 million to Shanghai Bank, beneficiary SPSoft China;

     c.     Almost 60 checks totaling over $5.4 million to accounts under the control of CHAO;

     d.     Over 40 checks totaling over $1.3 million to accounts under the control of SZE;

     e.     Over $3.5 million to Mooteec Account 2. However, during the same time period, over $3.5 million was sent from Mooteec Account 2 to Mooteec Account 1;

f.      The remaining funds, over $1.2 million, were sent to the IRS, California

Franchise Tax Board, and used to pay payroll and payroll taxes.

61.     According to documents from the California Employment Development Department

("EDD"), four individuals were listed on Mooteec's payroll during 2018 and 2019, when all payroll

payments from Mooteec were posted. These individuals were CHAO, CHAO'S wife, CHAO's sister,

and SZE. Nearly $500,000 in payroll disbursements were posted during this period.

a.      Accounts controlled by CHAO and CHAO's wife received over $350,000

between October 2018 and November 2019 via payroll direct deposits from Mooteec. These

occurred in regular monthly payments, one for each CHAO and CHAO's wife, ranging between

approximately $8,000 and $14,000 each.

b.      Accounts controlled by SZE received over $100,000 between August 2018 and

November 2019 via payroll direct deposits from Mooteec. These deposits occurred in regular

monthly payments, ranging approximately between $5,000 and $6,000, with the exception of one

payment in January 2019 for over $13,000.

c.      Accounts controlled by SZE's sister received disbursements from Mooteec in the

form of checks and direct deposit payments. In 2016, CHAO's sister received approximately

$500 per month, as well as two payments for over $19,000, all paid via checks. In November

2017, the amount increased to approximately $1,000 per month, also via checks. Then from

February 2019 through November 2019, CHAO's sister received monthly "payroll" payments of

over $1,600 via direct deposits. CHAO's sister also received three checks from Mooteec in

December 2017, November 2018, and December 2018, totaling approximately $60,000.

62.     Most deposits received by Mooteec Account 1 appear to have been endorsed by SZE. For

example, a check from SPSoft to Mooteec dated September 12, 2019, in the amount of $197,415.86

appears to be endorsed by SZE. A picture of the check after it was deposited is as follows:



63.     The following is an example of SZE's signature. This was from the signature card for one of SZE's bank accounts:



64.     In total, from January 2016 to February 2020, almost $17 million was deposited into Mooteec Account 1. During the same period, almost $17 million was withdrawn by CHAO or SZE, or paid back to SPSoft. In contrast to activity typically observed in business bank accounts, there was minimal activity outside of these large deposits, withdrawals, and money returned to the original sender. A very small amount was used to pay payroll and taxes (of which most was received by CHAO, SZE, and their family members) and miscellaneous expenses.

65.     3140 De La Cruz Blvd., Suite 200, Santa Clara, California was listed as the street address for:

    a.   The principal executive office of Mooteec and the address of the sole manager of Mooteec (CHAO's brother-in-law) on forms filed with the California Secretary of State;

    b.   On tax returns filed by Mooteec.

66.    During FBI surveillance at this address, there were no offices identified as Mooteec. The business located at Suite 200 was a Certified Public Accountant's (CPA) office. The CPA located at this address did conduct other work for CHAO and Mooteec but was not listed as an employee of Mooteec.

67.    An additional address, a post office box located in Fremont, California, was listed as a mailing address for Mooteec. Records from the EDD list CHAO's home address, 3415 Stacey Court, Mountain View, California 94040, as the address for Mooteec.

68.    Open-source research conducted by the FBI resulted in the discovery of www.mooteec.com. Based on my training and experience, this website lacked information typically seen on websites of operational businesses. Open-source research did not locate any advertising, company details, or storefronts for Mooteec.

69.    For tax returns filed by Mooteec from 2014 to 2019, at least 77% of the business deductions were for "outside services." From 2018 to 2019, salaries paid to SZE and CHAO represented at least another 9% of all business deductions. These tax returns listed Mooteec's principal product or service as software development. Based on my training and experience, typically, legitimate businesses involved in software development, and most businesses in general, would experience additional operating expenses other than outside services and director salaries, such as employee wages, research and development, buildings or office expenses, software expenses, etc.

70.    For tax returns filed by Mooteec from 2014 to 2019, almost all the ordinary income experienced by Mooteec was distributed to SZE and CHAO. Incomes listed on tax returns, and capital distributions, were as follows:

      a.      According to the 2013 tax return, the business was started in July 2013.

      b.      In 2014, ordinary business income was approximately $595,143. Capital distributions to SZE and CHAO was approximately $454,325.

      c.      In 2015, ordinary business income was approximately $866,003. Capital distributions to SZE and CHAO was approximately $809,043.

      d.      In 2016, ordinary business income was approximately $873,706. Capital distributions to SZE and CHAO was approximately $1,057,400.

      e.      In 2017, ordinary business income was approximately $2,652,840. Capital distributions to SZE and CHAO was approximately $2,027,215.

      f.      In 2018, ordinary business income was approximately $1,587,310. Capital distributions to SZE and CHAO was approximately $1,578,280.

      g.      In 2019, ordinary business income was approximately $1,791,370. Capital distributions to SZE and CHAO was approximately $1,100,000.

71.    Based on my training and experience, typically, businesses, especially new businesses, will keep capital in the business in order to fund the growth of the business, to save for unexpected costs, and to fund continuing business operations. As outlined previously, almost all income received by Mooteec was distributed to SZE and CHAO.

72.    Mooteec does not appear to have any legitimate purpose other than moving money from SPSoft to CHAO, SZE, and co-conspirators. Based on my training and experience, Mooteec appears to be a shell corporation used by CHAO, SZE, and other co-conspirators to move money from SPSoft to CHAO, SZE, and other co-conspirators in furtherance of the kickback scheme. CHAO and SZE appear to be using Mooteec to conceal, or cause it to be more difficult to track, the movement of funds, and the purpose of funds moving from Company-1 to CHAO, SZE, and co-conspirators.

***Examination of CHAO's Work Devices and Email***

73.     Company-1 provided the FBI with the email accounts and the Company-1-owned electronic devices utilized by CHAO and SZE during their employment at Company-1. The FBI examined these devices, and discovered CHAO used his Company-1 email account to forward Company-1 budgeting spreadsheets for fiscal year 2019 to his personal Yahoo e-mail account. The spreadsheets showed how much money was allocated to different Company-1 software programs for the fiscal year.

74.     The Silicon Valley Regional Computer Forensics Laboratory (SVRCFL) reviewed a forensic image of CHAO's Company-1-assigned electronic devices. A report generated by the SVRCFL included the following information:

a.   A computer user, username "kchao", opened a file named "MooTeecExpenseSummary2014Dec-V1.xls" and the file was located on the computer inside a folder named "Personal" when it had been opened. There were four other similar files located on CHAO's devices. A similarly labeled document also appeared to be viewed in a Yahoo e-mail address accessed by the kchao user profile. The document appeared to be located in a Yahoo e-mail folder labeled "Expenses-MooTeec." There is a high correlation that this activity occurred in a Yahoo e-mail account with the username "kevin0422."

b.   A report generated by the SVRCFL focused on CHAO's internet browsing history. CHAO's work computer showed he downloaded a file named "Folio-A-Attachment" from a mail folder named "Expenses-MooTeec." Therefore, it appears CHAO downloaded files related to Mooteec on his work computer. Internet history files on CHAO's work computer also showed other email folders named "MooTeec" and a file containing Company-2's name.

75.     This information suggests that CHAO was using Company-1 devices to access files associated with Mooteec.

### *CHAO and SZE's Communications*

76.     The FBI obtained telephone records for telephone numbers known to be used by CHAO and SZE from 2015 through August 2021. According to these records, CHAO and SZE called each other over a thousand times during this period. CHAO and SZE called each other during most months, and even during most weeks, throughout this time period. A larger number of these calls occurred in 2019 and 2020. CHAO and SZE called each other almost 100 times in 2021, including calls taking place in August 2021.

77.     According to these records, CHAO and SZE sent text messages to each other thousands of times during the period examined. CHAO and SZE texted each other during most months, and even during most weeks, throughout this time period. A larger number of these texts occurred in 2019 and 2020. CHAO and SZE texted each other hundreds of times in 2021 alone, including multiple times during August 2021.

78.     This information suggests that CHAO and SZE had continued communication on personally-owned electronic devices throughout the time the scheme described above was occurring, and CHAO and SZE continued to communicate after they left Company-1, through the present, on these personally-owned electronic devices.

### *Summary*

79.     As outlined previously, CHAO and SZE participated in a scheme to defraud Company-1 of honest services by ensuring contracts paid for by Company-1 were steered towards SPSoft. SPSoft then paid kickbacks to Mooteec, which appears to be under the control of SZE and CHAO. CHAO and SZE then moved the funds through Mooteec accounts (with no apparent legitimate business purpose) and into accounts under their control. This money could have been put towards Company-1 projects, but instead was routed to accounts under the control of CHAO and SZE.

80.      Approximately $6.7 million under the control of CHAO and SZE was diverted to accounts under their control through this scheme. Money received by CHAO and SZE represented approximately a quarter of an annual budget for their department. CHAO also cost Company-1 employee-time resources, such as CHAO's assistant spending most of their time paying SPSoft invoices at the direction of CHAO and SZE.

81.      By operating outside of Company-1's typical payment process, CHAO and SZE made it more difficult for other employees at Company-1 to uncover or prevent the amount of money being directed from Company-1 to SPSoft. Once they were aware of how CHAO's and SZE's department at Company-1 issued payments to SPSoft, several employees at Company-1 were surprised by the process being used to pay SPSoft and the amount of money paid to SPSoft. According to employees at Company-1, if they noticed the amounts paid to SPSoft, and how the invoices were being paid, they would have found it suspicious and would have investigated it further.

82.      It appears that CHAO and SZE took deliberate steps to cause payments to be below approval and oversight thresholds, such as not using purchase orders, in violation of Company-1's directives, and keeping invoices to SPSoft below $100,000 (which would have required authorization at Company-1 above CHAO). CHAO and SZE were counseled by other employees at Company-1 multiple times to fix these anomalies, but they did not. CHAO and SZE showed they understood the process, because four other large vendors of their department were successfully transitioned to the typical payment process around the same time.

83.      Furthermore, CHAO and SZE passed funds received by SPSoft through Mooteec, an entity under their control, to their personally controlled accounts. There did not appear to be any legitimate purpose to pass these funds through Mooteec, and Mooteec does not appear to have any legitimate business dealings. Based on my training and experience, I believe the funds were passed through Mooteec to obscure that the funds were ultimately received by CHAO and SZE. CHAO

additionally used Company-1 devices to access files for Mooteec, which did not appear to have any legitimate connection to Company-1.

84.     Due to CHAO's and SZE's senior level positions at Company-1, Company-1 depended on CHAO and SZE to use their discretion and expertise to adequately manage the funds under the control of their department. CHAO was considered a trusted advisor and was expected by management to arrange for the delivery of products with limited direction. CHAO's duties included setting and monitoring his department's budget at Company-1. Company-1 relied on CHAO to monitor work being provided by contractors, such as SPSoft. During the majority of time CHAO carried out this illicit activity, he was in control of most aspects of his department, including what products to create and how to accomplish the creation of these products. According to CHAO's subordinates, they followed orders given by CHAO, whether or not they agreed with the directives.

85.     SZE had oversight over a significant number of the department's contractors, and at least one Company-1 employee considered him to oversee all the department's contractors. SZE made decisions on which contractors to keep, and which contractors to discontinue, including on at least one occasion steering Company-1 contracting work from another contractor to SPSoft. SZE also had the authority and insight into approving SPSoft invoices, through CHAO's assistant (who was instructed by CHAO to approve SPSoft invoices).

86.     CHAO and SZE both signed policies that required them to avoid any situation that might conflict with the best interest of Company-1 and required them to avoid circumstances where their personal interest may conflict with Company-1 or where their influence at Company-1 may be used for personal gain to Company-1's disadvantage. Both CHAO and SZE were also required to attend annual ethics training at Company-1 on the topic of avoiding any conflict of interest.

87.     Despite several employees raising concerns to SZE and CHAO about the quality of SPSoft's work and these employees' preference to work with other contractors, SZE and CHAO

continued to steer most of the contracting work to SPSoft. Even after being ordered by superiors to discontinue SPSoft contractors, CHAO continued to use SPSoft contractors at Company-1. SPSoft became the second or third largest vendor, in the largest segment of Company-1's entire company.

## COUNT ONE: TITLE 18 U.S.C. §1343 AND §1346 HONEST SERVICES WIRE FRAUD

88.     As outlined previously, Company-1 relied on CHAO and SZE to manage and pay contractors to perform work for Company-1. Instead, CHAO and SZE participated in a scheme to defraud Company-1 of honest services by ensuring contracts paid for by Company-1 were steered towards SPSoft, which paid kickbacks to Mooteec, an entity controlled by CHAO and SZE. Once money was sent to Mooteec, Mooteec deposited millions of dollars into personal accounts controlled by CHAO, SZE, and co-conspirators. During CHAO and SZE's tenure at Company-1, SPSoft became one of Company-1's largest vendors. Over $30 million was sent from Company-1 to one SPSoft account (representing almost all the money deposited into the SPSoft account). Mooteec bank accounts received almost $17 million from the same SPSoft account (representing almost all the money deposited into the Mooteec accounts). Of these funds, almost all the money was sent back to SPSoft entities (different SPSoft banks accounts than the account Company-1 deposited funds into) or to bank accounts under the control of CHAO and SZE.

89.     On February 22, 2019, Company-1 wired over $775,000 to the SPSoft Account mentioned previously, a Citi Bank checking account. According to a Company-1 employee, the payment was sent from a Company-1 Wells Fargo bank account.

90.     According to Company-1 documentation, the payment was for 68 SPSoft invoices billed to Company-1. All these invoices were listed in Company-1's accounting system as being approved by a Company-1 account belonging to CHAO. There were 35 invoices, all dated November 23, 2018, totaling over $389,000 and 33 invoices, all dated December 21, 2018, totaling over $385,000. None of these invoices were above $100,000.

91.     All 68 SPSoft invoices were dated after CHAO was instructed to change to the PO-process. As discussed previously, any invoice over $100,000 would have required additional approval, other than CHAO's or SZE's. There does not appear to be a legitimate business purpose for submitting these many invoices on the same date. As described previously, typically, contractors would submit these charges as a single invoice. Therefore, it appears likely that the invoices were submitted this way to avoid additional approvals or review by other Company-1 employees. Due to my training and experience, I am aware that structuring amounts owed to vendors into smaller invoices, knowing that it will cause the invoices to be below certain approval thresholds, is a common technique to avoid controls and detections put in place by companies.

92.     As mentioned previously, Citi Bank and Wells Fargo are defined by United States Code as financial institutions and are insured by the Federal Deposit Insurance Corporation. Citi Bank is headquartered in New York, New York and Wells Fargo is headquartered in San Francisco, California. Therefore, the wire communication on February 22, 2019 constitutes a wire communication used in interstate commerce, caused by KEVIN CHAO, in furtherance of the scheme to defraud Company-1.

## COUNT TWO: TITLE 18 U.S.C. §1956 MONEY LAUNDERING

93.     On September 19, 2019, a check from SPSoft to Mooteec dated September 12, 2019 for $197,415.86 was deposited into Mooteec Account 1. The check appears to be endorsed by SZE. A picture of the check after it was deposited is as follows:



94.     The following is an example of SZE's signature. This was from the signature card for one

of SZE's bank accounts:



95.     As outlined previously, CHAO and SZE participated in a scheme to defraud Company-1

of honest services wire fraud in violation of Title 18 U.S.C. §1343 and §1346. Both CHAO and SZE

were aware and responsible for Company-1 paying SPSoft for contracting services and both CHAO and

SZE controlled Mooteec. Since Mooteec appeared to have no legitimate business purpose, and almost all

of the money from Mooteec was received from SPSoft as a part of the scheme, money flowing through

Mooteec represents attempts by CHAO and SZE to conceal the source of the funds. Thus, this

transaction represents a specific instance of money laundering by CHAO and SZE under Title 18 U.S.C.

§1956.

## COUNT THREE: TITLE 18 U.S.C. §1349 CONSPIRACY

96.     As outlined previously, CHAO and SZE participated in a scheme to defraud Company-1 of honest services wire fraud in violation of Title 18 U.S.C. §1343 and §1346, and money laundering in violation of Title 18 U.S.C. §1956.

97.     SZE reported directly to CHAO at Company-1 since 2005 and they had worked together at a different company prior to Company-1. Both CHAO and SZE had significant oversight over contractors and payments to contractors while at Company-1. They both caused contracting work to be steered to or remain with SPSoft while at Company-1, causing millions of dollars to be paid by Company-1 to SPSoft.

98.     As employees of Company-1 in positions of authority, CHAO and SZE had knowledge of how vendors were paid by Company-1, and, more specifically, Company-1's purchase order and non-purchase order systems. Presumably, under CHAO and SZE's direction, SPSoft submitted invoices through the Non-PO system (which was intended for smaller bills owed by Company-1) and as a result were able to submit a greater volume of invoices, and therefore payment from Company-1, approved without drawing attention of other employees at Company-1. Both CHAO and SZE had the ability to approve SPSoft invoices, either formally as in CHAO's case, or informally, as E-13 (who was tasked by CHAO to approve SPSoft invoices using his credentials) reported consulting with SZE to approve invoices.

99.     Kickbacks were paid from SPSoft to Mooteec, a company controlled primary by SZE and CHAO, as they were listed as the only owners on Mooteec's tax returns and were authorized signers on Mooteec's bank accounts. Millions of dollars were then paid from Mooteec to CHAO, SZE and their co-conspirators.

100.    As discussed previously, CHAO and SZE had continued communication on personally-owned electronic devices throughout the time the scheme described above was occurring, and CHAO

and SZE continued to communicate after they left Company-1, through the present, on these personally-owned electronic devices.

101.    The aforementioned shows that CHAO and SZE conspired to carry out a scheme to defraud Company-1 of honest services in violation of Title 18 U.S.C. §1349.

## CONCLUSION

102.    Based on the information above, it is my opinion that there is probable cause to believe KEVIN CHAO has committed Wire Fraud, Honest Services Wire Fraud, Conspiracy to Commit Wire Fraud, and Money Laundering in violation of Title 18 U.S.C. §1343, §1346, §1349, and §1956, and RICHARD SZE has committed Conspiracy to Commit Wire Fraud and Money Laundering in violation of Title 18 U.S.C. §1349 and §1956. Therefore, I respectfully request that the Court issue a criminal complaint and a warrant to arrest KEVIN CHAO and RICHARD SZE.

## REQUEST FOR SEALING

103.    I respectfully request that the Court issue an order sealing, until further order of the Court, the criminal complaint and the arrest warrants, and all papers submitted in support of the complaints and warrants, including this affidavit.

104.    These documents discuss the financial aspect of an ongoing federal criminal investigation that is likely not known to the **TARGET SUBJECTS** and other coconspirators. Further, there is good cause to seal these documents, as their premature disclosure may alert the **TARGET SUBJECTS** and other co-conspirators with respect to the financial investigation.

105.    I believe that disclosure at this time would seriously jeopardize the investigation and would allow CHAO, SZE, and co-conspirators to change patterns of behavior or destroy evidence. I believe that sealing is necessary to effectuate the orderly arrest of CHAO and SZE and to guard against flight and destruction of evidence.

I declare under penalty of perjury that the above is true and correct to the best of my knowledge.

/s/
_____

MICHAEL TOMENO
Special Agent
Federal Bureau of Investigation

Sworn to before me over the telephone and signed by me pursuant to Fed. R. Crim. P. 4.1 and 4(d) on

this ___27___ day of October 2021.

_____

HON. ROBERT M. ILLMAN
United States Magistrate Judge